***This is a nonprecedential memorandum opinion
pursuant to ORAP 10.30 and may not be cited
except as provided in ORAP 10.30(1).***

Argued and submitted on September 27; on petition, reversed and remanded; on cross-petition, affirmed December 7, 2022

OLD HAZELDELL QUARRY, LLC,
*Respondent
Cross-Petitioner,*

*v.*

LANE COUNTY,
*Respondent
Cross-Respondent,*

*and*

SAVE TV BUTTE,
Linda McMahon, Tim Caughlin,
Keegan Coughlin, Jenny Caughlin,
Kevin Matthews, Michael Garvin,
Patricia Beard, Cascadia Wildlands,
and LandWatch Lane County,
*Petitioners
Cross-Respondents.*

Land Use Board of Appeals
2021102; A179203

Charles W. Woodward, IV, argued the cause for petitioners-cross-respondents. On the briefs was Sean T. Malone.

Seth J. King argued the cause for respondent-cross petitioner Old Hazeldell Quarry, LLC. Also on the brief were Steven L. Pfeiffer and Perkins Coie LLP.

No appearance for respondent-cross-respondent Lane County.

Before James, Presiding Judge, and Aoyagi, Judge, and Joyce, Judge.

JOYCE, J.

On petition, reversed and remanded. On cross-petition, affirmed.

**JOYCE, J.**

Intervenors Save TV Butte *et al* seek review of an order of the Land Use Board of Appeals (LUBA), arguing that LUBA incorrectly reversed a decision of the Board of County Commissioners for Lane County (the county) that denied applicant's application for a comprehensive plan amendment, adoption of comprehensive plan and zoning map amendments, and approval of a site plan for a quarry.[1] In a cross-petition, applicant contends that LUBA incorrectly denied, in part, its motion to take evidence outside the record. On review, we consider whether LUBA's order is "unlawful in substance or procedure," ORS 197.850(9)(a). We reverse and remand on the petition and affirm on the cross-petition.

Because the background facts, procedural history, and relevant legal framework are well known to the parties and LUBA, we do not discuss them here. In the order at issue, the county applied OAR 660-023-0180(5)(a) to (g) to determine whether mining was permitted on the site. It determined that, given that intervenors had not previously contended that there was evidence indicating that the impact area should extend beyond 1,500 feet of the boundaries of the mining area, they had waived any argument to that effect and, consequently, the relevant impact area was the area within 1,500 feet of the boundaries of the mining area. *See* OAR 660-023-0180(5)(a) (explaining how to determine the impact area). A previous LUBA remand established that the county's designation of a substantial part of the impact area as Goal 5 big game habitat meant that those parts of the impact area were "Goal 5 resource sites within the impact area" that had to be addressed as part of the county's consideration of "existing or approved land uses within the impact area that will be adversely affected by proposed mining operations." OAR 660-023-0180(5)(b)(D).

Thus, the first issue before the county was whether the big game habitat in the impact area would be adversely affected by the proposed mining operation, and what conflicts would arise. OAR 660-023-0180(5)(b). The evidence in

---

[1] The county has waived appearance.

the record on that subject was presented in several reports of Robison, applicant's wildlife biologist; a report and a letter from Goodell, intervenors' wildlife biologist; and two letters from Yee, the South Willamette Watershed District Wildlife Biologist for the Oregon Department of Fish and Wildlife (ODFW). The county found that the big game habitat in the impact area would be adversely affected by the proposed mining operation, and the main conflicts that it identified were (1) a collision conflict (risk of vehicles hitting big game); (2) a displacement conflict (for elk, who would leave the big game habitat in the impact area for most of the 20 to 50 years during which the mine was active); and (3) a direct-loss-of-habitat conflict (for deer, who would remain in the big game habitat in the impact area but would suffer significant detrimental effects in foraging, overwintering, and fawning due to the nearby mining operations).

Having identified those three conflicts, the county considered whether the conflicts could be minimized through "reasonable and practicable measures." OAR 660-023-0180 (5)(c). As relevant for that analysis, to "'[m]inimize a conflict' means to reduce an identified conflict to a level that is no longer significant." OAR 660-023-0180(1)(g).

For the collision conflict, the county determined that the applicant's proposed condition of approval number 50, which required road signs warning of elk and deer and the need to drive 25 miles per hour or less in certain areas, would minimize the conflict. For the other two conflicts—the displacement conflict and the direct-loss-of-habitat conflict—the county adopted facts and analysis from Yee's letters, and, based on those facts and that analysis, ultimately concluded that the conflicts were significant and would not be minimized by the measures identified by applicant.

Yee's letters were written in response to Robison's testimony, and, to understand them, it is first necessary to understand Robison's testimony. Robison, the applicant's wildlife biologist, opined that the mining operation would likely cause the deer and elk living in the big game habitat to leave the impact area—"relocate"—"temporarily," by which he meant "during periods of time when [mining] activities

are occurring (6 days/week for up to 50 years)." The relocation would be caused by "disturbance," a concept that encompasses effects of both noise and, as Robison noted, other "anthropogenic activities."[2] In his most direct explanation of why the deer and elk would leave the big game habitat in the impact area, Robison explained that "it is likely that surface mining activity, and related increases in vehicle and human traffic, will result in elk movement away from the site, potential abandonment by pre[-] and post-calving cows in the event that a calving site is located within the project area, potential decreases in local reproduction, and possible increases in local mortality[.]"

However, in Robison's view, for a variety of reasons, the displacement conflict—the fact that, in his view, deer and elk would leave the big game habitat in the impact area— was not significant, and, thus, did not need to be minimized. In support of that view, he pointed out that the elk could move from the Goal 5 big game habitat in the impact area to adjacent national forest land. He explained that, "[a]lthough Roosevelt Elk currently using *** the impact area will be impacted via disturbance and these disturbance impacts may subject these elk to increased stress hormone response, decreased birth rates and other behavioral responses," the conflict was nevertheless not significant because "we believe that any elk using the area will at some point in time likely redistribute themselves within their home ranges as needed to adjust to increased disturbance levels and carry out life history needs." He noted that any decreases in reproduction in the impact area "would not significantly impact the Oakridge population for Roosevelt Elk" and that herds often change composition, suggesting that elk from the impact area could join other local herds. He also noted that mining activities in the impact area would take place in three phases, allowing more time for deer and elk to adjust to the

---

[2] "Anthropogenic" means "involving the impact of human beings on nature : induced or altered by the presence and activities of human beings." *Webster's Third New Int'l Dictionary* 93 (unabridged ed 2002).

Some of Robison's statements are ambiguous as to whether the "disturbance" that will cause displacement is caused by noise alone, or also encompasses other factors. However, his testimony as a whole makes clear that "disturbance," as a term both in the relevant literature and in his own analysis, refers to consequences of human activity including more than noise alone.

new levels of disturbance; because some of the impact area was close to areas of high human activity already, the deer and elk were already highly adapted to "noise and disturbance from localized anthropogenic activities"; and some of the big game range in the impact area was classified as "impacted range," the lowest quality habitat for big game.

For all those reasons, Robison asserted that, under the circumstances, the displacement conflict—that is, his conclusion that elk would leave the Goal 5 big game habitat in the impact area—was not "significant." In his view, then, minimization through "reasonable and practicable measures" was not strictly necessary. *See* OAR 660-023-0180(5)(b), (c) (requiring identification and minimization of conflicts); OAR 660-023-0180(1)(g) (to "'[m]inimize a conflict' means to reduce an identified conflict to a level that is no longer significant").

Despite Robinson's conclusion that minimization measures were not needed, applicant proposed four conditions of approval (Conditions 21-24) that would use a variety of strategies to achieve compliance with noise regulations promulgated by the Department of Environmental Quality (DEQ). In response, intervenors argued that the conditions were not useful for minimizing conflicts because the DEQ noise standards were set with the goal of protecting humans in industrial settings, not avoiding disruption to wildlife. In response, Robison explained the purpose of the conditions as follows:

> "The reference to conditions of approval designed to ensure compliance with the DEQ noise regulations was added to our original analysis to provide further requirements for reducing noise at the site and therefore reducing the potential for noise related disturbance to big game living within the impact area. *The use of DEQ noise control measures was added to lessen the magnitude of any impacts from noise; it was not intended to establish the DEQ rule as a 'safe harbor' as applied to wildlife.* We maintain our position that in our best professional judgment, compliance with these conditions will *help* minimize conflicts with big game in the quarry impact area."

(Emphases added.)

With that background in mind, we turn to the two letters from Yee, the ODFW district biologist, on which the county relied in its order. Yee agreed with Robison's conclusion that elk would be displaced from the big game habitat in the impact area as a result of the mining activities. He referred to the displacement of the elk as an indirect loss of habitat; that is, the Goal 5 big game habitat in the impact area would indirectly be lost because the elk would not use it for 20 to 50 years due to the mining activities. Yee explained that, contrary to Robison's view that the displacement of elk for 20 to 50 years the mine was in operation was "temporary," in his view, that displacement, and the consequent indirect loss of habitat, should be considered long term.

Yee also disagreed with Robison about deer, concluding that the deer and elk would be affected by the mining activity in different ways, rather than in the same way. He explained that, unlike elk, deer in the impact area would not likely "relocate outside of their home ranges even when disturbance occurs." Thus, he concluded, the deer would remain in the Goal 5 big game habitat in the impact area rather than moving elsewhere. As a result, he explained, the disturbance from the nearby mining activity—the same disturbance that, as Robison had explained, would cause the elk to relocate—would directly affect the deer in the impact area, causing significant consequences to "foraging, overwintering, and fawning." For that reason, he, and the county, in its findings, referred to the third conflict, regarding deer, as a direct-loss-of-habitat conflict: The deer would remain in the Goal 5 big game habitat in the impact area, but the mining activities would make it unsuitable for them. That unsuitability, and the consequent effects on the ability of the deer to forage, overwinter, and reproduce in the big game range in the impact area would, functionally, cause that Goal 5 big game habitat to be lost.

Yee also noted that ODFW was concerned that the conflicts between big game habitat and the mining activity would extend beyond 1,500 feet from the mining area boundaries. Finally, Yee disagreed with Robison that the elk would relocate to adjacent national forest land, explaining that that land "is extremely poor quality elk habitat." In

his view, the elk would move to nearby private lands, and he noted that the potential consequences of the relocation included damage to private property, additional elk mortality from hunting, and a greater burden on ODFW. Yee did not note whether those consequences would take place only outside the impact area or both inside and outside the impact area.

Yee noted that ODFW was "concerned" about the displacement conflict, and he noted that "[t]he proposed Conditions of Approval (21-24) do not seem to address the issue of displacement other than those impacts related to noise." Yee's recommendations included the following:

"Further discussion and mitigating measures regarding the potential for displacement. The proposed Conditions of Approval [] do not adequately address concerns for displacement or concerns related to habitat loss [based on the fact that the elk would not occupy the big game habitat in the impact area for 20 to 50 years and the deer would occupy it but suffer adverse effects] and the resulting direct [(to deer)] and indirect [(to elk)] impacts in both the short and long-term life of the project."

In its order, the county characterized Robison's opinion as being that "disturbances associated with increases in ambient noise levels" would cause "temporary displacement of big game." It summarized its understanding of the reasons that, in Robison's opinion, although the displacement would occur, it nevertheless would not be significant:

"Mr. Robison reached this conclusion because the habitat within the impact area would remain intact, the deer and elk in the area naturally move within home ranges that extend beyond the impact area (in fact, well beyond the impact area in the case of elk), mining activities would be phased in over time (which would allow deer and elk time to adjust), the area is already highly disturbed by human activity (due to an active railroad, active airstrip, nearby residences, Highway 58, recreational activities such as mountain biking and hiking, and urban development associated with the City of Oakridge), the fact that the County itself has deemed the western half of the impact area as 'Impacted Big Game Range,' which is the 'lowest quality habitat and has essentially been "written off" for Big Game

management,' and implementation of the noise mitigation measures set forth in COA 21, 22, 23, and 24, which would minimize noise conflicts with big game in the impact area."

However, based on Yee's letters, the county rejected Robison's contention that the conflicts regarding elk (displacement) and deer (direct loss of habitat) were not significant. It noted that, in contrast to Robison, Yee believed "the impacts are long-term and measurable." The county agreed with Yee's conclusion that "the mining activities create impacts that will adversely affect the nearby Big Game habitat." Ultimately, the county found that Yee's letters

"demonstrate that mining activities would result in conflicts to Big Game and that the applicant's proposed conditions of approval are inadequate to sufficiently minimize significant conflicts to Big Game. Specifically, the [County] finds that the measures proposed by the applicant, including Conditions of Approval 21-24, are insufficient to reduce the conflicts with Big Game habitat (specifically, the likely displacement of resident elk herds and loss of habitat to deer and elk) such that the conflicts are no longer significant, as required by OAR 660-023-0180."

Having concluded that the displacement and loss-of-habitat conflicts were significant and would not be minimized by the proposed conditions of approval, the county went on to perform the analysis of economic, social, environmental, and energy consequences (ESEE analysis) required by OAR 660-023-0180(5)(d). *See* OAR 660-023-0010(2) (defining ESEE analysis); OAR 660-023-0180(5)(c) ("If reasonable and practicable measures are identified to minimize all identified conflicts, mining shall be allowed at the site and subsection (d) of this section is not applicable. If identified conflicts cannot be minimized, subsection (d) of this section applies."). After conducting that analysis, it decided not to allow mining at the site.

Applicant sought LUBA review. Applicant made two arguments about the conflict and minimization findings: It contended, first, that the county's findings were generally inadequate for LUBA's review, and second, that Yee's letters, on which the findings were based, did not qualify as substantial evidence to support the findings. Applicant did not contend that there was no evidence in the record

to support the board's conclusion. Instead, its substantial evidence argument was that Yee's letters in particular were not substantial evidence and, accordingly, did not provide support for the county's findings. Thus, applicant's substantial evidence argument was actually a more particularized contention that the county's findings were inadequate.

LUBA addressed only the substantial evidence argument. LUBA explained that applicant made three arguments in support of the conclusion that Yee's letters were insufficiently reasoned to qualify as "evidence that a reasonable person would rely on in making a decision." *See Dodd v. Hood River County*, 317 Or 172, 179, 855 P2d 608 (1993) (describing substantial evidence). First, applicant argued that Yee had acknowledged that the conditions of approval addressed "conflicts from noise" by stating, "The proposed Conditions of Approval (21-24) do not seem to address the issue of displacement other than those impacts related to noise." In applicant's view, Yee's statement did not adequately explain why "if [it is true that the conditions addressed noise], Robison's predicted conclusion (that there would be less displacement as a result of reducing noise impacts) does not follow."

Second, apparently based on Yee's characterization of the conflict as to the deer habitat as involving a direct loss of habitat, applicant argued that Yee's letters evaluated displacement from the mining area itself, not just from the 1,500-foot impact area, and, consequently, a reasonable person would not rely on Yee's letters with respect to displacement in the impact area. Third, applicant argued that Yee's letters also evaluated displacement conflicts more than 1,500 feet from the mining area boundaries—and, consequently, outside the impact area—and that, given that the letters were ambiguous in that respect, a reasonable person would not rely on them to support a finding that there was a conflict inside the impact area.

LUBA concluded that Yee's letters "are not evidence a reasonable person would rely on to conclude that conflicts from displacement of deer and elk due to noise from the mining operation cannot be minimized to an insignificant level." LUBA agreed with applicant that Yee had

acknowledged that conditions of approval 21 to 24 addressed conflicts due to noise (again, in his statement that "[t]he proposed Conditions of Approval (21-24) do not seem to address the issue of displacement other than those impacts related to noise") and held that, given that, Yee's letters were "not evidence a reasonable person would rely on to conclude that conflicts from noise cannot be minimized to an insignificant level." LUBA also agreed with applicant that Yee's letters "are ambiguous regarding the extent to which ODFW's evaluation of conflicts is limited only to conflicts with Big Game Range in the impact area, as required by OAR 660-023-0180(5)(c)." LUBA cited statements in Yee's first letter indicating that ODFW jurisdiction extends beyond the impact area and that, in ODFW's view, to limit the analysis to 1,500 feet from the boundary of the mining area did not accurately reflect the consequences of the conflicts. It also noted that Yee's second letter discussed consequences of the displacement of the elk, some of which would take place outside the impact area. Finally, LUBA held that Yee's second letter was not evidence on which a reasonable person would rely because it "discusses other impacts that are both speculative and indirectly related to the mining operation"—specifically, the consequences of the displacement of the elk from the big game habitat in the impact area. LUBA stated that those consequences—which Yee had noted would include damage to agricultural lands, fences and other features on private property, additional workload for ODFW, and negative impacts on ODFW's damage program—"are *** not relevant conflicts because they are not tied to the impact area."

LUBA thus rejected the county's reliance on Yee's letters. Because those letters were the main evidence on which the county had relied to support its findings that the displacement and direct-loss-of-habitat conflicts existed, were significant, and would not be minimized by conditions of approval 21 to 24, LUBA reasoned that those findings were not supported by substantial evidence in the whole record.[3] *See Dodd*, 317 Or at 179 (substantial evidence exists

---

[3] Given applicant's arguments, described above, we understand LUBA's conclusion to indicate that the county did not adequately explain its reasoning, rather than representing an (unrequested) evaluation of all of the evidence in the

when the record "would permit a reasonable person to make that finding"). LUBA also stated, "On remand, the county's analysis of conflicts with Big Game Range in the impact area must be limited to conflicts from displacement of deer and elk from the impact area due to noise from the mining operations, which is the only identified cause of displacement that is supported by the record."

Intervenors seek review, contending that LUBA incorrectly stated and applied its standard of review. They contend that LUBA's determination that Yee's letters did not constitute substantial evidence was based on an incomplete and incorrect view of both the letters and the other evidence in the record. They also take issue with LUBA's statement, in describing the scope of remand, that noise is the only cause of the displacement and direct-loss-of-habitat conflicts.

On review, our task is not to assess for ourselves whether Yee's letters constituted substantial evidence; rather, the question for us is whether LUBA correctly understood and applied *its* standard of review. *Younger v. City of Portland*, 305 Or 346, 358, 752 P2d 262 (1988). "[W]here LUBA has properly understood and applied the 'substantial evidence' test of ORS 197.835[(9)(a)], a reviewing court should affirm its order, notwithstanding the reviewing court's disagreement with LUBA as to whether the evidence is 'substantial.'" *Id.*; *see also* ORS 197.850(8) ("The court may not substitute its judgment for that of [LUBA] as to any issue of fact."). However, "[t]he evidence in a particular case might be so at odds with LUBA's evaluation that a reviewing court could infer that LUBA had misunderstood or misapplied its scope of review, and reversal or remand might be proper." *Younger*, 305 Or at 359.

As noted above, the question before LUBA was whether Yee's letters, viewed in the context of the record as a whole, was evidence on which a reasonable person would

---

record. *See Citizens for Responsibility v. Lane County*, 218 Or App 339, 345, 180 P3d 35 (2008) (in an ordinary substantial evidence challenge, "LUBA considers all the evidence in the entire record in evaluating whether a factual finding is supported by substantial evidence and determines whether a reasonable person could make that finding").

rely. *See Dodd*, 317 Or at 179 ("Substantial evidence exists to support a finding of fact when the record, viewed as a whole, would permit a reasonable person to make that finding."). Here, LUBA's conclusion that Yee's letters were not substantial evidence resulted from a misapplication of its standard of review: LUBA considered Yee's letters out of their necessary context, specifically, Robison's submissions on the same issue, to which Yee's letters were responding.

Viewed in context with Robison's submissions, Yee's letters (1) agreed with Robison's conclusion that the mining activity, including both noise *and* the other "anthropogenic activities" of the mining operation, would cause the elk to leave the Goal 5 big game habitat in the impact area; (2) explained that, contrary to Robison's assertion that the deer would also leave the impact area, the deer would stay and suffer direct negative consequences from the same disturbance; and (3) noted that, although Robison acknowledged that the broader concept of disturbance would cause the displacement of the elk (and, as Yee explained, the direct consequences to the deer, which would stay in the impact area), applicant's proposed conditions did not address disturbance as a whole but only noise. With that understanding, Yee's letters support the conclusion that, even assuming conflicts based on noise alone were minimized by conditions of approval 21 to 24 (which, as explained above, Robison did not assert that they were), the displacement and direct-loss-of-habitat conflicts were not minimized by those conditions because those conflicts were not caused by noise alone.

Another result of considering Yee's letters out of the context of the record as a whole was that LUBA misunderstood why the letters discussed consequences of the displacement conflict that would take place outside the 1,500-foot impact area. As noted above, the letters indicated that, in ODFW's view, the impact area should be extended beyond 1,500 feet from the boundaries of the mining area. *See* OAR 660-023-0180(5)(a) (impact area "shall be limited to 1,500 feet from the boundaries of the mining area, except where factual information indicates significant potential conflicts beyond this distance"). Before the county, intervenors argued the same thing. The county concluded that that argument was foreclosed given the procedural posture

of the case. That determination by the county, and the consequence that Yee's letters included information supporting an argument that the county ultimately rejected, has no effect on the reliability of the rest of the letters' analysis.

Finally, LUBA's failure to consider the letters in context led to its incorrect conclusion that various consequences that Yee identified—damage to agricultural lands, fences, and other features on private property, additional workload for ODFW, and negative impacts on ODFW's damage program "are *** not relevant conflicts because they are not tied to the impact area." As explained above, Robison concluded, and Yee and the county agreed, that the elk would leave the Goal 5 big game habitat in the impact area. Robison contended that that conflict was insignificant because the elk would simply relocate to adjacent national forest land.

We will accept, for the sake of argument, the view that the significance of a conflict between Goal 5 wildlife habitat and a proposed use that causes wildlife to vacate the Goal 5 wildlife habitat depends on whether the wildlife can occupy other areas instead.[4] Given that assumption, one of the questions for the county was whether the displacement conflict, which the biologists agreed existed, was significant because it would have adverse consequences other than the displacement itself. Robison's view was that it was not, because the elk could relocate to the adjacent national forest land and join other herds. In the letters, Yee responded to that view by explaining that the adjacent national forest land was "extremely poor quality elk habitat" and that the elk would relocate to nearby private lands instead. He explained that, in the past, ODFW had worked to break up large herds on private lands in the area, because they caused damage. As a result, in his view, the conflict *was* significant because the relocation to private lands would cause significant consequences to the private landowners

_____

[4] We understand Yee's description of the conflicts as involving indirect (for the elk) and direct (for the deer) loss of habitat to be a rejection of that view. However, as explained below, Yee's letters also respond to Robison's argument on its own terms by indicating that, even if the analysis considers only whether the relocation of the elk will cause significant consequences apart from the relocation itself, the conflict is still significant.

and ODFW. Regardless of whether the consequences that he identified were directly relevant to the analysis given the county's conclusion that, for procedural reasons, the impact area was limited to 1,500 feet from the boundaries of the mining area, his explanation was nevertheless fully responsive to Robison's contention that the displacement conflict was not significant. Yee's inclusion of that information thus did not undermine the reliability of his conclusions.

Because LUBA considered Yee's letters out of context, it misunderstood their significance and, in turn, did not correctly evaluate whether they were evidence on which a reasonable person would rely. Thus, LUBA misapplied its standard of review and, consequently, its decision was unlawful in substance. ORS 197.850(9)(a); *Younger*, 305 Or at 358.

We also briefly consider LUBA's statement that, "[o]n remand, the county's analysis of conflicts with Big Game Range in the impact area must be limited to conflicts from displacement of deer and elk from the impact area due to noise from the mining operations, which is the only identified cause of displacement that is supported by the record." As set out above, 323 Or App at 131, in its description of Robison's testimony in the order, the county characterized Robison's testimony as being that the disturbance that would cause the displacement was "associated with increases in ambient noise levels," rather than recognizing that Robison's testimony was that noise *and other human activity* would create disturbance that would cause the elk to relocate. As we have explained, Yee understood Robison's conclusion about displacement to rest on both noise and other anthropogenic activity, and he agreed with that assessment (at least as to the elk). The county's characterization of Robison's testimony as going to noise alone, on one hand, and its reliance on Yee's testimony and reasoning, which was based on Yee's agreement with Robison's conclusion that displacement would result from more than noise alone, on the other hand, suggest that the order is internally inconsistent. However, contrary to LUBA's statement about the scope of remand, noise is not the only identified cause of displacement that is supported by the record. We leave it to LUBA, on remand,

to determine the appropriate next steps. We reverse and remand on the petition.

Next, we consider the cross-petition, in which applicant challenges LUBA's failure "to grant [applicant's] request to take depositions and discovery" that, applicant believed, would reveal evidence of two commissioners' bias against applicant and the application.[5] We reject the argument in the cross-petition as inadequately developed for our review. Even assuming the correctness of applicant's view that, under ORS 197.835(2)(b) and OAR 665-010-0045(1), LUBA lacks discretion to deny a motion to take evidence outside the record under certain circumstances, including those presented here, applicant's argument fails to grapple with, or even acknowledge, the text of OAR 661-010-0045(2), which contains a variety of requirements that must be met in order for LUBA to order discovery. In the absence of any argument from applicant about how those requirements are satisfied, we are in no position to address applicant's argument on the merits. *See Beall Transport Equipment Co. v. Southern Pacific*, 186 Or App 696, 700-01 n 2, 64 P3d 1193, *adh'd to as clarified on recons*, 187 Or App 472, 68 P3d 259 (2003) ("[I]t is not this court's function to speculate as to what a party's argument might be" or "to make or develop a party's argument when that party has not endeavored to do so itself."). Thus, we affirm on the cross-petition.

On petition, reversed and remanded. On cross-petition, affirmed.

_____

[5] Applicant sought to depose two of the county commissioners, and also sought an unspecified number of requests for production, the contents of which were also unspecified.